John H. FOURNELLE, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

BETHLEHEM STEEL CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

John H. Fournelle, Intervenor.

Nos. 80–2211, 80–2466.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 25, 1981.

Decided Feb. 2, 1982.

Paul Alan Levy, Washington, D. C., with whom Alan B. Morrison and James R. Klimaski, Washington, D. C., were on brief for Fournelle, petitioner in No. 80–2211 and intervenor in No. 80–2466.

Warren M. Davison, Washington, D. C., with whom Earle K. Shawe, Baltimore, Md., was on brief for Bethlehem Steel Corp., petitioner in No. 80–2466.

Diana Orantes Ceresi, Atty., N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, and Richard B. Bader, Atty., N. L. R. B., Washington, D. C., were on brief for respondent.

Before MacKINNON, ROBB and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This case initially arose as a result of an unfair labor practice charge filed by John H. Fournelle, an employee at Bethlehem Steel Corporation, on August 4, 1978. A Complaint was issued on September 28, 1978, and amended on March 9, 1979, alleging that Bethlehem violated sections 8(a)(3) and (1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(3) and (1), by suspending Fournelle for ten days "because of his position as welding department committeeman in the Union." Joint Appendix ("J.A.") at 3.

On September 14, 1979, the Administrative Law Judge (ALJ) issued a decision finding that Fournelle had in fact participated in and supported an unauthorized strike. However, the ALJ also found that Bethlehem had discriminated against Fournelle on the basis of his union position by suspending him for ten days as compared with the five-day suspensions issued to other strikers. ALJ at 983–87.[1] On September 30, 1980, although sharply divided, see

---

1. "ALJ" refers to the decision of the ALJ. See note 4 infra.

note 6 *infra*, a three-member panel of the National Labor Relations Board ("NLRB" or "Board"), with one member dissenting, affirmed the rulings, findings and conclusions of the ALJ and adopted the ALJ's Recommended Order. ALJ at 982–83. Fournelle and Bethlehem have petitioned for review of the order of the Board, and the NLRB has cross-petitioned for enforcement of that order.[2]

Two issues are presented on this appeal. First, we must decide whether Fournelle was lawfully subject to *any* discipline. Fournelle does not dispute the finding of the Board that he traveled to and participated in a strike meeting after he left work, at which meeting he voted and made statements supporting the strikers' cause. Nor does he deny that the other employees engaged in an unprotected strike. Instead he argues that, because he had left work on the day in question, for reasons unconnected with the strike, and because a company work rule prevented his return to work on the day of the strike, he was not properly subject to discipline under a contractual term that forbade employees to encourage, sanction, or take part in strikes. We reject Fournelle's arguments, concluding that the cited collective bargaining agreement effectively waived any rights that Fournelle might otherwise have had to escape discipline for his actions at the union hall.

Second, we must decide whether to enforce the decision of the Board that Bethlehem violated sections 8(a)(1) and (3)[3] of the NLRA by punishing Fournelle, a union official, more harshly than other strike participants. We deny enforcement of the Board's order and hold that the Board should have given effect to a clear arbitral decision that interpreted the contract as allowing the selectively greater punishment

of union officials who engage in unauthorized strikes.

## I. BACKGROUND

### A. *The Strike and its Aftermath*

Although the parties disagree about the legal significance of the underlying facts, the facts themselves are not disputed. The findings of the ALJ, affirmed by the Board, may be briefly summarized.[4]

On the morning of July 28, 1978, approximately 162 employees in the welding department at the shipyard of Bethlehem at Sparrows Point, Maryland, walked off the job and assembled at the union hall. ALJ at 983. The walkout was a protest against the suspension by Bethlehem of Jim Childs, a union steward. *Id.* This concerted work stoppage, all parties agree, was a "wildcat" strike in violation of the collective bargaining agreement then in effect between Bethlehem and the Industrial Union of Marine and Shipbuilding Workers, AFL–CIO, and its affiliated Local 33 ("IUMSW"). Fournelle Br. at 4 & n.4; Bd. Br. at 11; Bethlehem Br. at 6. Article XVIII of the Bethlehem-IUMSW agreement provided:

During the term of this Agreement neither the Union nor any Employee shall instigate, encourage, sanction, or take part in any strike, sit-down, slowdown or other stoppage, limitation or curtailment of work or production, or take part in any picketing, boycotting or other interference with or demonstration against any Yard or its business or operations, either in such Yard or elsewhere .... The Company may terminate the employment of or otherwise discipline any Employee who willfully violates any of the provi-

---

**2.** This court has jurisdiction under 29 U.S.C. §§ 160(e) & (f). For the published report of the decision of the NLRB and that of the Administrative Law Judge, see *Bethlehem Steel Corp.*, 252 N.L.R.B. 982 (1980).

**3.** These statutory provisions are quoted at note 5 *infra*.

**4.** The decision of the ALJ, appended to the Decision and Order of the Board, is reported at 252 N.L.R.B. 982, 983–87 (1980). Following a careful review of the record before us, we hold that the factual findings of the ALJ regarding Fournelle's conduct on July 28 are supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

sions of this Agreement in any material respect.

J.A. at 26–27.

Petitioner Fournelle, an elected union committeeman, left work at about the same time that the other employees left, but, as the ALJ found, Fournelle did not leave for reasons connected with the wildcat strike. Instead, he left because his clothes had become wet in a rainstorm, which made it potentially dangerous to perform his work as an arc welder, and "because he had determined to take the day off in any event to see his dentist to have a broken tooth repaired before the weekend." ALJ at 986. After he left work, Fournelle went home and changed his wet clothes. He then went to a local bar, cashed his paycheck, had a few drinks, and decided to go to the meeting of the wildcat strikers at the union hall. *Id.* at 985.

When Fournelle joined the strikers at the union hall, he found the place "dark and in some confusion." *Id.* A television news crew arrived at the hall, and sought permission to film the meeting and interview some of the strikers. Some union officers initially refused to allow the television crew to enter, but upon a motion by Fournelle the workers voted to allow the crew to remain and conduct interviews. *Id.* One of the workers interviewed was Fournelle, and he expressed his opinion that Bethlehem's discipline of steward Childs was unjustified; he further complained about working conditions at Bethlehem: "They are increasing the amount of work we have to put out. We've been called to the office for low production. They want us to be their slaves, and they're offering us no other choice but to stand up for ourselves." *Id.* After the meeting at the union hall concluded, Fournelle went to another bar and made an appointment with his dentist. The

dentist repaired Fournelle's damaged tooth later that afternoon. *Id.* at 986.

The next workday, July 31, Fournelle reported for work with a note from his dentist certifying that he had been in the dentist's office for treatment. Management officials attempted to interview Fournelle about his conduct at the union hall, but Fournelle was uncooperative. Three days later, Bethlehem notified Fournelle that he was to be suspended for ten days; the disciplinary report stated that Fournelle was being punished for "participating as an elected union official in a work stoppage on July 28, 1978 in violation of Article XVIII of the Agreement." *Id.* Bethlehem subsequently disciplined the rank-and-file participants in the work stoppage less severely: they were given five-day suspensions. *Id.* at 983.

### B. *The Proceedings Below*

On August .4, 1978, Fournelle filed an unfair labor practice charge against Bethlehem. J.A. at 1. The General Counsel of the NLRB issued a complaint on September 28, 1978, and amended it on March 9, 1979, alleging that Bethlehem had violated sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. §§ 158(a)(1) and (3),[5] by suspending Fournelle because of his position as a union committeeman. J.A. at 2–5.

After a hearing, the Administrative Law Judge concluded that Fournelle, by his actions at the union hall, had violated the term of the collective bargaining agreement that expressly forbade employees to "instigate, encourage, sanction, or take part in any strike, sit-down, slowdown or other stoppage . . . of work." J.A. at 26. The ALJ stated that Fournelle

> by his conduct at the union hall in supporting the unprotected strike became a participant therein in violation of the

---

**5.** Sections 8(a)(1) and (3), 29 U.S.C. §§ 158(a)(1), (3), provide, in pertinent part:

> *(a) Unfair labor practices by employer*
> It shall be an unfair labor practice for an employer—
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

> . . . .
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
> . . . .

contractual no-strike provision, and was subject to discipline on the same basis as any of the other employees who partici-pated in the illegal walkout.
ALJ at 986.

The ALJ further found that Bethlehem had violated sections 8(a)(1) and (3) of the Act by punishing Fournelle more harshly than other employees "solely because he was an elected union official." *Id.* at 987. The ALJ accordingly ordered Bethlehem to pay Fournelle back pay for five days, to expunge Fournelle's disciplinary records, to post a notice, and to cease and desist from similar practices in the future. *Id.* A divided panel of the NLRB affirmed the ALJ's findings and conclusions and adopted his recommended Order.[6]

## II. FOURNELLE'S PARTICIPATION IN UNPROTECTED ACTIVITY

The first question presented is whether Fournelle was properly subject to any discipline for his actions at the union hall. Fournelle contends that he was immune to discipline because his actions were protected by section 7 of the NLRA;[7] Bethlehem and the NLRB respond that the collective bargaining agreement effectively waived any section 7 rights that Fournelle might otherwise have had.

■ Section 7 of the Act grants to employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."[8] An employee's section 7 rights to engage in concerted activities, however, are neither unqualified nor absolute.[9] Additionally, and more important for present purposes, certain rights granted by section 7 may be waived pursuant to collective bargaining.

■ In the United States, it is commonplace for unions and employers to enter collective bargaining agreements that waive the rights of employees to engage in strikes during the contract term. *See NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967); *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956); *NLRB v. Sands Mfg. Co.*, 306 U.S. 332, 344, 59 S.Ct. 508, 514, 83 L.Ed. 682 (1939). Thus, even though, in the absence of an explicit or implied[10] no-strike

---

6. Board Member Penello agreed with the conclusion that Fournelle participated in an unprotected strike, but expressed the opinion that an employer may "discipline a union official more harshly than other employees for participating in an unprotected strike, because the official has thereby failed to fulfill his contractual responsibility to take affirmative action to bring such a strike to an end." 252 N.L.R.B. at 982.
   Chairman Fanning agreed with the conclusion that Fournelle participated in the strike, but disclaimed any reliance on *Bechtel Corp.*, 200 N.L.R.B. 503 (1972), a case cited by the ALJ. 252 N.L.R.B. at 982 n.3. *See* notes 13 and 14 *infra* and accompanying text.
   Member Jenkins approved the ALJ's remedy but stated that he would have further required Bethlehem to make Fournelle whole for the entire ten-day suspension. 252 N.L.R.B. at 982 n.4.

7. Section 7 of the Act, 29 U.S.C. § 157, provides in full:
   *§ 157. Right of employees as to organization, collective bargaining, etc.*
      Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through

representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

8. *Id.*

9. *See, e.g., Emporium Capwell Co. v. Western Addition Community Org.*, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975). In *Emporium Capwell*, the Court held that the principle of majority rule was so strong as to render unprotected under the NLRA even the attempts of a racial minority within the union to protest their employer's allegedly racially discriminatory employment practices outside of the collectively bargained grievance machinery.

10. *See Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) (the Court implied a no-strike promise com-

promise, economic strikers may be protected from employer discipline, including discharge,[11] an employer may so discipline employees who engage in strikes in breach of contract. *NLRB v. Sands Mfg. Co., supra; Silbaugh v. NLRB*, 429 F.2d 761 (D.C.Cir. 1970).

The policies compelling the Board and courts to honor such contractual waivers are fundamental ones under the NLRA. As the Supreme Court stated in *Mastro Plastics Corp. v. NLRB, supra*, such waivers enable the parties to substitute peaceful means of dispute resolution—grievance procedures and arbitration—in place of economic warfare. "Provided the selection of the bargaining representative remains free, such waivers contribute to the normal flow of commerce and to the maintenance of regular production schedules." 350 U.S. at 280 (emphasis deleted). It has long been understood and accepted practice under the NLRA that a "union may . . . bargain away [the employee's] right to strike during the contract term, and his right to refuse to cross a lawful picket line." *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. at 180, 87 S.Ct. at 2006 (footnote omitted). One of the principal reasons for this development in the law was stated by the Court in *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970): "As labor organizations grew in strength and developed toward maturity, congressional emphasis shifted from protection of the nascent labor movement to encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes." *Id.* at 251, 90 S.Ct. at 1592. It is thus commonplace for the Board and the courts to recognize and enforce contractual strike proscriptions.

Fournelle does not dispute that the collective bargaining agreement between his union and Bethlehem effectively waived the rights of the *other* employees to engage in the July 28 strike. Fournelle Br. at 4 & n.4. Rather, he argues that, because he had left work on July 28 for reasons unconnected with the strike, and because he was forbidden by a company work rule from returning to work once he had left for the day,[12] he cannot be found to have participated in the strike.

■ Although novel, Fournelle's argument has little merit. It is clear that the agreement in this case sought to forbid explicitly a wide range of employees' strike-related activity, *i.e.*, other than the simple withholding of labor. Article XVIII of the agreement explicitly states that during the term of the agreement "neither the Union nor any Employee shall instigate, *encourage, sanction*, or take part in any strike, sit-down, slowdown or other stoppage, limitation or curtailment of work or production, or take part in any picketing, boycotting or *other interference* with or demonstration against any Yard or its business or operations, either in such Yard *or elsewhere*. . . . The Company may terminate the employment of or otherwise discipline any Employee who willfully violates any of the provisions of this Agreement in any material respect." J.A. at 26–27 (emphasis added). It is thus plain that Fournelle's conduct on July 28 was prohibited by the contract. He voluntarily traveled to join the strikers at the union hall. ALJ at 985. When he arrived there, he made a motion and then voted to allow the television crew to remain in the hall, presumably so as to publicize the strikers' grievances. *Id.* His statements in the television interview indicated his strong support of the strikers' goals. In other words, he encouraged and sanctioned the

mensurate with the grievance-arbitration clause in the collective bargaining agreement).

charge of such strikers solely because of union activity is an unfair labor practice).

**11.** *See NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 83 L.Ed. 1381 (1938) (economic strikers may be permanently replaced, but they retain protections accorded "employees" by the Act; hence, dis-

**12.** Fournelle testified before the ALJ, apparently without contradiction, regarding the work rule. J.A. at 77–78.

strike, as specifically forbidden by the contract.[13]

As an alternative position, Fournelle argues that the Board and the ALJ did not specifically "rely on" the language of the contract precluding employees from "sanctioning" or "encouraging" a strike and, therefore, this court cannot sustain the Board's decision "on that basis." Fournelle Rep. Br. at 3 n.3. This argument fails in its initial premise: the ALJ's decision, affirmed by the Board, stated that Fournelle "by his conduct at the Union hall in supporting the unprotected strike became a participant therein in violation of the contractual no-strike provision." ALJ at 986. The ALJ clearly had in mind the contractual language at issue, although he buttressed his conclusion with other, arguably inapposite, authority.[14] To require a greater clarity in the ALJ's reasoning would be a meaningless formalism: as the Supreme Court said in another context, "[s]ubstantive rights and duties in the field of labor-management do not depend on verbal ritual reminiscent of medieval real property law." *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 75, 73 S.Ct. 519, 522, 97 L.Ed. 832 (1953).

■ Even though the contract explicitly forbade Fournelle's conduct, we must consider one further argument. Fournelle argues that the contractual provision prohibiting employees from sanctioning or encouraging strikes, if applied to justify his suspension, would constitute an impermissible waiver of his section 7 right to comment freely about the strike and the grievances underlying it. This right to comment, Fournelle contends, cannot be waived in collective bargaining.

It is true that the Supreme Court has held that some of the rights guaranteed by section 7 of the Act cannot be waived by collective bargaining. In *NLRB v. Magnavox Co.*, 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974), the Court considered an employer's rule forbidding employees to disseminate literature regarding union elections in nonworking areas of the plant during nonworking time. The Court held that this rule, otherwise invalid, could not be rendered valid by a provision in the collective bargaining agreement that purported to give the employer the power to restrict such dissemination. The Court, citing *Mastro Plastics*, recognized that section 7 rights "in the economic area" could be waived through collective bargaining, but held that "a different rule should obtain where the rights of the employees to exercise their choice of a bargaining representative is involved—whether to have no bargaining representative, or to retain the present one, or to obtain a new one." 415 U.S. at 325, 94 S.Ct. at 1102. The Court noted that it had anticipated such a distinction in *Mastro Plastics* when it stated that waivers in the economic area "rest on 'the premise of fair representation' and presuppose that the selection of the bargaining representative 'remains free.'" 415 U.S. at 325, 94 S.Ct. at 1102 (citing *Mastro Plastics*, 350 U.S. at 280, 76 S.Ct. at 356).

■ Because the Board properly found that Fournelle did more than just "comment" on the strike, and because the strike waiver as applied here clearly does not pertain to activity of the sort found to be

**13.** Because of the particular facts in this case, we are not faced with a situation where an employee has been disciplined for failure to disavow a union-sanctioned unprotected strike. *See United Elec. Workers Local 1113 v. NLRB*, 223 F.2d 338 (D.C.Cir.1955), *cert. denied*, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956) (An employer could discharge certain union members who were not present at the employer's plant when the union-sanctioned strike was initiated, and who by their silence and their failure to disavow the strike "bec[a]me parties to their agent's action." *Id.* at 343). *Local 1113*

is relevant here to the extent that it holds that an employee may become a participant in unprotected activity even though his initial absence from work is unrelated to strike activity. *See also Bechtel Corp.*, 200 N.L.R.B. 503 (1972). We would not push the analogy to *Local 1113* too far, however, because it poses obvious problems. Fortunately, the facts here are such that we need not attempt to delimit the reach of the holdings in *Local 1113*.

**14.** The ALJ cited *Bechtel Corp.*, note 13 *supra*. ALJ at 986.

protected in *Magnavox*, we can find no merit in this last argument raised by Fournelle. The same policies that support a simple waiver of the right to engage in economic strikes likewise support a waiver of the right to sanction and encourage contractually forbidden strikes. A strike is more than the mere withholding of labor. It may gain impetus, direction and duration as a result of the conduct of employees who, though not contractually obligated to be at work during the strike, nonetheless lend their voices and their presence to strike activity. A contract provision that permits discipline of employees who sanction and encourage strikes, as well as of those who withhold their labor, may thus significantly reduce the frequency and duration of disruptive strikes. Simple waivers of the right to strike are favored because they enable the parties to substitute peaceful conciliation for economic warfare, and thus "contribute to the normal flow of commerce and to the maintenance of regular production schedules." *Mastro Plastics*, 350 U.S. at 280, 76 S.Ct. at 356. Because the same is true of waivers of the right to sanction or encourage strikes, we hold that such waivers are permissible under the NLRA. Fournelle's conduct at the union hall was therefore unprotected and, according to the contract, he could be punished for sanctioning and encouraging the strike.

## III. THE LEGALITY OF SELECTIVE DISCIPLINE FOR UNION OFFICIALS

As noted above, the collective bargaining agreement effectively waived Fournelle's rights to escape any discipline for his actions at the union hall. Thus, we uphold the conclusion of the Board that Bethlehem acted permissibly in suspending Fournelle for five days, the same punishment imposed on the other strikers. We turn now to a consideration of the Board's ruling that Bethlehem violated the NLRA by suspending Fournelle for an *additional* five days. Our analysis of this second issue proceeds in two stages. First, we consider whether the parties to a collective bargaining agreement may legitimately agree that union officials may be more severely punished than other employees for violation of a contractual no-strike clause; on this point, we conclude that the parties may reach such an agreement. Second, in section IV, we consider whether a clear arbitration ruling by the parties' own permanent umpire, holding that selective discipline is permissible under the parties' collective agreement, should be given the same effect as clear contractual language permitting disparate discipline; on this second issue, we conclude that in this case the arbitrator's ruling should be considered authoritative.

We are not called upon in this case to decide whether an employer may selectively discipline a union official in a situation where the collective bargaining agreement is neutral on the question (*i.e.*, the contract contains only a *general* no-strike clause) and there is no clear arbitration decision construing the contract to allow for selective discipline. In such a situation, if the union official is not otherwise a leader of the unprotected strike, selective discipline may run afoul of sections 8(a)(1) and (3) of the NLRA.[15] However, we need not decide this question. In the present case we need only inquire whether the parties may, through the collective bargaining process, create higher duties for union officials during strikes and whether the parties may thus waive the rights of union officials to escape selectively greater discipline for their violation of those higher duties.

15. *See, e.g., Metropolitan Edison Co. v. NLRB*, 663 F.2d 478 (3d Cir. 1981) (absent contractual basis for union official's higher responsibility, employer's disparately harsh punishment of union officials held to constitute unfair labor practice); *Hammermill Paper Co. v. NLRB*, 658 F.2d 155, 163 (3d Cir. 1981) (same); *C. H. Heist Corp. v. NLRB*, 657 F.2d 178, 182–83 (7th Cir. 1981) (same). *Cf. NLRB v. Armour-Dial, Inc.*, 638 F.2d 51, 56 (8th Cir. 1981) (contractual basis for higher responsibility apparently unnecessary when union officials act as leaders of strike); *Indiana & Michigan Elec. Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979) (contract language providing that continuous employer operation was "essential" and that employees "will not be called upon or permitted" to engage in strikes apparently held to impose higher duties on union officials).

█ The Board has been notably inconsistent in answering this question. In *Super Valu Xenia*, 228 N.L.R.B. 1254 (1977), the Board sustained an employer's disciplinary discharge of two union stewards who participated in a strike in violation of the contractual no-strike clause. The Board, adopting the reasoning of the ALJ, noted that the collective bargaining agreement imposed on the union an obligation to "undertake every reasonable means to induce [striking] employees to return to their job," and gave the employer the right to discharge union stewards who failed to fulfill this obligation. *Id.* at 1259. Hence the Board rejected the contention that the employer "violated Section 8(a)(1) and (3) of the Act by 'impos[ing] a greater duty on its stewards to end unauthorized strikes.'" *Id.* It found that the stewards "were discharged because they joined and participated in the unauthorized work stoppage and consequently failed to fulfill their obligations as stewards.... not in response to or in retaliation for legal or protected activities engaged in by them as a consequence of their union stewardships." *Id.* Counsel for the Board expressed the view at oral argument that the *Super Valu Xenia* decision remains authoritative Board precedent for the proposition that the parties may contractually impose higher duties on union officials during strikes, and that an employer may discharge officials who disregard those duties. Counsel's assertion is rendered dubious, however, by the Board's decisions in *Precision Castings Co.*, 233 N.L.R.B. 183 (1977), and *Gould Corp.*, 237 N.L.R.B. 881 (1978), *enforcement denied*, 612 F.2d 728 (3d Cir. 1979), *cert. denied*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). In *Precision Castings*, the Board held that an employer violated section 8(a)(3) by selectively disciplining union stewards who participated in a walkout in breach of contract. The Board found it immaterial that the parties had included in their collective bargaining agreement a pro-

vision requiring the union to "take all reasonable steps to restore normal operations" in the event of a strike. 233 N.L.R.B. at 183. Regardless of the existence of this clause, the Board held, "discrimination directed against an employee on the basis of his or her holding union office is contrary to the plain meaning of Section 8(a)(3) and would frustrate the policies of the Act if allowed to stand." *Id.* at 184. Similarly, in *Gould*, the Board held that the discharge of a union steward who had joined a work stoppage in violation of contract was "not validated by a contract clause that specifie[d] the responsibilities of union officers" during strikes. 237 N.L.R.B. at 881. The Board buttressed its reliance on *Precision Castings* with the wholly unconvincing argument that the contract term setting higher duties for union officials was "binding between the Employer and the union, but [did] not grant the employer the power to enforce it by discharging union officials."[16] *Id.*

Until recently, therefore, the Board appeared to have adopted a *per se* rule forbidding the selective discipline of union officials, regardless of whether the parties had collectively bargained for a different result. This *per se* rule, however, as we discuss below, has been unanimously rejected by the courts of appeals that have considered it. In light of this rejection, the Board appears to have retreated from the extreme position taken in the *Precision Castings* and *Gould* cases. In *Armour-Dial, Inc.*, 245 N.L.R.B. 959 (1979), *enforcement denied*, 638 F.2d 51 (8th Cir. 1981), the Board found unlawful an employer's selective discipline of union officials, but noted specifically that the no-strike clause of the contract contained no clause imposing higher duties on union officials. The Board noted that it did not "reach the issue of whether a union could, by contract, waive an employee's right to engage in protected concerted activity through the holding of union office by providing for the discipline of union

**16.** This argument simply ignores the principle that a valid waiver of an employee's rights to engage in concerted activity renders such activity unprotected by the NLRA. Rank-and-file employees may be discharged for disobeying a contractual no-strike clause; there is no reason why a valid provision waiving the rights of union officials should have any different effect.

officials." 245 N.L.R.B. at 960 n.8. The Board's current position with respect to the *per se* rule of *Precision Castings* is thus unclear.[17]

Although the Board has vacillated in its adherence to the *per se* rule, the courts of appeals considering the rule have firmly rejected it. The Third Circuit, on petition for review of the Board's decision in *Gould, Gould, Inc. v. NLRB*, 612 F.2d 728 (3d Cir. 1979), *cert. denied*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980), rejected the Board's conclusion that it was an unfair labor practice for an employer to discharge union officials who disobeyed a contract term requiring union officials to take positive steps to terminate contractually forbidden strikes. As the same court later noted, in a summary of the *Gould* decision, "where a collective bargaining agreement explicitly requires union officers and representatives to use every reasonable effort to terminate an unauthorized 'work stoppage,' an employer may single out for disciplinary discharge a union steward who fails to take affirmative steps to terminate that work stoppage." *Hammermill Paper Co. v. NLRB*, 658 F.2d 155, 163 (3d Cir. 1981) (holding that where contract does not authorize employer's selective discharge of union officials, discharge violates section 8(a)(3)).

The Seventh Circuit has reached the same conclusion. That court, in *Indiana & Michigan Electric Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979), refused to enforce the Board's finding that an employer had violated the Act by selectively disciplining union officials who engaged in a strike where the contract contained language that the court interpreted as imposing special duties on union officials. *See id.* at 228, 230; *C. H. Heist Corp. v. NLRB*, 657 F.2d 178, 183 (7th Cir. 1981) (characterizing the contractual basis for the union officials' higher duty in *Indiana & Michigan Electric* as "tenuous" and refusing to infer such a duty from a generally worded no strike clause).[18]

This unanimous rejection of the Board's *per se* rule is also supported by the general principles of waiver that we have examined above. If union officials have a right, in the absence of a contract term to the contrary, to escape harsher punishment for their participation in unauthorized strikes, this is a right "in the economic area," subject to contractual waiver under *Mastro Plastics, supra,* and not a right pertaining to the choice of the bargaining representative protected from waiver by *Magnavox, supra.* The parties to a collective bargaining agreement may seek to increase the effectiveness of a no-strike clause by providing for heightened efforts on the part of union officials to avoid or reduce the disruptive effects of strikes during the contract term. Provision of harsher penalties for union officials who disobey these duties may spur union officials to honor those duties. Allowing the parties to give effect to such contractual terms furthers the strong national labor policy of substituting peaceful dispute resolution for industrial strife, and the equally strong policy of free-

---

**17.** Whether the Board·has applied the *per se* rule in this case is unclear. *See* note 19 *infra.*

**18.** The Eighth Circuit, in *NLRB v. Armour-Dial, Inc.*, 638 F.2d 51 (8th Cir. 1981), refused to enforce the Board's finding of an unfair labor practice in an employer's suspension of union officials because of the officials' participation in an unauthorized work stoppage. The court did not discuss whether the collective bargaining agreement imposed higher duties on union officials during strikes. Such a requirement, however, was immaterial in the *Armour-Dial* case because, the court found, the union officials had assumed leadership roles in the work stoppage. Although the Board had not found on the facts that the union officials were strike leaders, Board precedent is clear that union officials who are strike leaders may be selectively punished. *See, e.g., Chrysler Corp.* 232 N.L.R.B. 466 (1977); *J. P. Wetherby Constr. Co.*, 182 N.L.R.B. 690 (1970).

Because the issue of Fournelle's possible assumption of a leadership role in the strike was not raised before the ALJ or the Board, we will not rely upon it here to justify Fournelle's selective discipline. *See* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."); *NLRB v. Ochoa Fertilizer Corp.*, 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961).

dom of contract. *See H. K. Porter Co. v. NLRB*, 397 U.S. 99, 107, 90 S.Ct. 821, 825, 25 L.Ed.2d 146 (1970). Thus, the Board should not attempt in this area to meddle with the legitimate products of the collective bargaining process.

That one group of employees is treated differently from another group under such a contract term is not in itself objectionable. As the Supreme Court said in *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) (upholding a contract term that provided seniority credits for employees with military service):

> Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

The contract's specific limitation on the exercise of section 7 rights by union officials is likewise not objectionable. The First Circuit, in *NLRB v. Wilson Freight Co.*, 604 F.2d 712 (1st Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 238 (1980), considered whether a union steward could be discharged for protesting certain statutory violations by his employer through channels disapproved by the contract. The court recognized that section 7 protects the rights of employees to be free from retaliation for their resort to administrative and judicial forums in an effort to improve working conditions, *id.* at 724 (citing *Eastex, Inc. v. NLRB*, 437 U.S. 556, 566, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978)). But the court held that where the collective bargaining agreement limited the powers of union officials to depart from specified channels in presenting complaints, the employer could discharge the union official who acted in disregard of the contract. The court saw "nothing contrary to sound collective bargaining principles" in the contract term. *Id.* at 726. "An individual employee's normal right, derived from § 7, to complain to officials and legislators does not prevent the parties to a collective bargaining relationship from placing limits upon the powers of particular union officials in order to lessen the danger of wildcat strikes and work stoppages and smooth the process of collective bargaining." *Id.*

Similarly, the Board and courts have upheld contract terms that provide limited superseniority for union officials when such superseniority furthers "the effective administration of bargaining agreements on the plant level by keeping the steward on the job." *Teamsters Local 20 v. NLRB*, 610 F.2d 991, 993 (D.C.Cir.1979) (citing *Dairylea Cooperative, Inc.*, 219 N.L.R.B. 656, 658 (1975), *enforced sub nom. NLRB v. Milk Drivers Local 338*, 531 F.2d 1162 (2d Cir. 1976)). Such terms may have the effect of encouraging employees to become union officials, as would normally be forbidden by section 8(a)(3), but when they serve a substantial and legitimate business purpose— "the effective administration of bargaining agreements"—they are permissible. Likewise, contract terms that provide for greater punishment of union officials who participate in strikes in violation of a no-strike clause are permissible because they promote the effective enforcement of the contractual no-strike clause.

■ For the reasons indicated, we hold that where the collective bargaining process has imposed higher duties upon union officials than the rank and file, the officials may be more harshly punished than the rank and file for their conduct in violation of the no-strike clause and an employer's selective discipline of the offending union official will not constitute an unfair labor practice.

## IV. GIVING EFFECT TO AN ARBITRATOR'S DECISION AS THE AUTHORITATIVE INTERPRETATION OF THE NO–STRIKE CLAUSE

We need not engage in an unaided examination of the contract to determine whether

Bethlehem and the IUMSW agreed that union officials could be more harshly punished. All we need decide is whether to give effect to an arbitration decision, construing the same no-strike clause at issue here but involving a different grievance claim. This arbitration decision explicitly held that union officials working under the Bethlehem-IUMSW agreement have higher duties during strikes than rank-and-file employees, and that breach of those duties may subject union officials to more severe discipline.

On June 5, 1978, Impartial Umpire Laurence E. Seibel rendered a binding arbitration decision based on facts virtually indistinguishable from those in the present case.[19] On July 7, 1977, seventeen employees in the Optical Detail Department at Bethlehem's Sparrows Point shipyard walked off the job. J.A. at 37–38. The rank-and-file employees who participated in the walkout were suspended for five days; the one union official who participated in the walkout, Shop Steward Gunkel, was suspended for ten days. Id. at 38. The disciplinary notice given to Gunkel stated that he was to be suspended for "participating as Shop Steward in a work stoppage . . . in violation of Article XXVIII [sic] of the Agreement." Id. The grievance submitted to arbitration, as umpire Seibel recognized, involved the questions (1) whether the walkout was in violation of the no-strike clause, (2) whether Steward Gunkel participated in the walkout and (3) whether the disparate penalty imposed on him was appropriate. Id. at 42.

Umpire Seibel found that the walkout was a concerted action by the employees in

protest of Bethlehem's temporary assignment of a non-bargaining-unit employee to work in the Optical Detail Department. Id. at 49. Accordingly, he found that the walkout was a violation of the no-strike clause. Id. at 49–50. Seibel further found that Steward Gunkel did in fact participate in the walkout. Id. Next Seibel turned to the issue of Gunkel's disparate punishment. His discussion of this point merits quotation at length:

> [T]here is no evidence that Gunkel, as a Shop Steward, took any action whatsoever to discourage the men from leaving and while he may well have not been the instigator nevertheless his inactivity could well be viewed as an encouragement or at least as representing tacit approval of what was happening. *As Shop Steward he was under an obligation to seek to dissuade the employees in the shop under his jurisdiction from taking any illegal work stoppage action* and evidence in this regard that he did so is completely lacking. *In my opinion, Grievant Gunkel's action or lack of actions cannot be regarded in the same vein as that of other employees. He had a greater obligation than they to make an effort to preclude violation of the Agreement* and in this respect he failed to meet such obligation. Accordingly, the imposition of an additional five day suspension does not appear to me to be unwarr[a]nted.

Id. at 50 (emphasis added).

Despite the contentions of the Board and Fournelle to the contrary, the decision interpreted the agreement[20] to allow Bethle-

19. J.A. at 36–50. Although the arbitrator's decision was a part of the administrative record, neither the ALJ nor the Board discussed its possible relevance. Thus, it is impossible to determine whether the Board's ruling should be interpreted as an application of the *per se* rule of *Precision Castings* or as a ruling that an arbitral interpretation cannot provide a valid indication of the parties' imposition of higher duties on union officials. Either result, as our holding today makes clear, would have been erroneous.

20. It is irrelevant that Umpire Seibel did not undertake a chapter-and-verse exegesis of the contractual document in rendering his decision. As the Supreme Court has stated, the arbitrator may fill "[g]aps" in the agreement "by reference to the practices of the particular industry and of the various shops covered by the agreement." *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 580, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960). In proceedings to enforce arbitration awards, the Court has held, even though "an arbitrator is confined to interpretation and application of the collective bargaining agreement," and "does

hem to selectively discipline union officials who disobey the no-strike clause. The decision did more than determine the fairness of a single act of discipline meted out to a single employee: it clearly rested on the premise that union officials have a "greater obligation . . . to make an effort to preclude violation" of the contractual no-strike provision. Breach of this obligation, Seibel concluded, merited selective discipline of the offending union official.

The meaning of the arbitrator's award is clear.[21] The remaining question is whether the award should have been accorded precedential effect by the Board. If the award should be given precedential effect, our inquiry need go no further: if the collective bargaining agreement authorized Bethlehem's selective discipline of Fournelle, then, for the reasons given in the preceding section, the Board erred in finding that discipline to constitute an unfair labor practice. But the Board and Fournelle argue that, because the contract does not explicitly provide that the arbitrator's decisions will be precedentially binding in later arbitrations, this court should ignore Umpire Seibel's decision.

This argument finds some support in the recent decision of the Third Circuit in *Metropolitan Edison Co. v. NLRB*, 663 F.2d 478 (3rd Cir. 1981). In that case the court affirmed the NLRB's finding of an employer's unfair labor practice under sections 8(a)(1) and (3). The employer had imposed disparately severe suspensions on two union officials who violated the no-strike clause of the collective bargaining agreement. The employer contended that the union officials had higher duties than the rank and file to prevent strikes during the contract term. In earlier arbitrations, the court noted, the union had twice "grieved to arbitration the issue of whether the Company could impose the extra discipline, and twice the Union lost." *Id.* at 480. The court found, however, that the language of the contract itself did not explicitly provide for such harsher discipline, and the court refused to be "bound by the arbitral awards construing the collective bargaining agreement to place greater responsibilities on union officials." *Id.* at 483. The court in *Metropolitan Edison* buttressed its refusal to be "bound" by the earlier decisions with the citation of authority holding that courts may not set aside arbitral decisions on the ground that the arbitrator failed to accord precedential value to earlier arbitral awards.[22] *See id.* But we are not con-

---

not sit to dispense his own brand of industrial justice," courts should enforce an award "so long as it draws its essence from the collective bargaining agreement." *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960).

**21.** Of course, if the arbitrator's award were obscure, or if there were conflicting arbitral rulings, there would be no clear indication of the meaning of the agreement. Lacking such a clear indication, we might be hesitant to uphold the disparate discipline of union officials. *See* note 15 *supra* and accompanying text.

The Board has argued that giving effect to the arbitrator's decision in this case would run afoul of the principle that waivers of employee rights must be undertaken in "clear and unmistakable" terms. *Cf. Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 281–83, 76 S.Ct. 349, 357–358, 100 L.Ed. 309 (1956) (absent explicit waiver of right to strike in protest of employer's unfair labor practices, such right is not waived). *But cf. Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 458–59 (3d Cir. 1981) (clear and unmistakable waiver of right to strike over administration of pension fund held

unnecessary where general contract term extended scope of no-strike clause beyond scope of arbitration clause). We believe it consistent with the Act that the arbitrator's decision in the present case clearly and unmistakably recognized the existence of the special duties of union officials. To go further and require that the *Board* rather than the arbitrator must be the one to declare the meaning of the parties' agreement would be to give to the Board a power that Congress has denied it. *See* discussion of *NLRB v. C & C Plywood Corp.*, infra.

**22.** The court cited *New Orleans Steamship Ass'n v. General Longshore Workers*, 626 F.2d 455, 468 (5th Cir. 1980) (holding that district court erred in issuing injunction against future work stoppages based on arbitral award prohibiting one such stoppage), *cert. granted sub nom. Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981), for the proposition, with which we have no disagreement, that an arbitrator "need not follow previous arbitrations construing the same agreement." *Metropolitan Edison*, 663 F.2d at 483.

cerned in the present case with the question whether a party who is disappointed by an arbitral award may attempt to avoid that award in court by pointing to a departure from arbitral precedent, and we have no quarrel with authority rebuffing such attempts. The question here is whether, on the one hand, the Board and courts should read the agreement in accordance with the clear ruling of the arbitrator or, on the other hand, should substitute their interpretation for the arbitrator's. We conclude, for the reasons set out below, that the Board erred in ignoring the arbitral interpretation of the contract.

The Supreme Court recognized in the *Steelworkers Trilogy* that arbitration is an essential part of the collective bargaining process. The Court explained in *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 580, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960), that "[a] collective bargaining agreement is an effort to erect a system of industrial self-government." Because of the complexity of the relationship between union and employer, and because of the overriding need of the parties to reach an agreement, "[g]aps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement." *Id.* Unlike commercial arbitration, where arbitration may be a symptom of the breakdown of the parties' relationship, "the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government." *Id.* at 581, 80 S.Ct. at 1352. "The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." *Id.* Thus the arbitrator's rulings may be as important a source of the rights and obligations of the parties as the contractual document itself. Moreover, "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *Id.* at 581–82, 80 S.Ct. at 1352–53. To put it succinctly: "[a]n award interpreting a collective bargaining agreement usually becomes a binding part of the agreement and will be applied by arbitrators thereafter." F. Elkouri & E. Elkouri, *How Arbitration Works* 377 (1973) (footnote omitted).

Thus, it is simply inconsistent with the realities of labor arbitration to maintain that, without an express contractual term giving the results of past arbitrations precedential effect, the arbitrator's rulings are isolated utterances without a general application to the ongoing collective bargaining relationship. This is especially true, as in the present case, of arbitration awards rendered by permanent umpires. As recognized by a respected authority on the arbitral process, "[t]he most pronounced situation in which prior arbitration awards have 'authoritative' type force is that of arbitra-

---

The court also cited *Riverboat Casino, Inc. v. Local Joint Executive Bd.*, 578 F.2d 250, 251 (9th Cir. 1978), for the proposition that "to require adherence to previous arbitration would reduce flexibility of the arbitral process." 663 F.2d at 483. The Ninth Circuit in the *Riverboat Casino* case dealt with a situation wholly unlike that in the present case: an employer challenged an arbitral award in that case, arguing that the arbitrator had disregarded earlier arbitral precedent, although the contract did not require the arbitrator to adhere to prior awards. The court refused to conclude on this ground that the arbitrator had exceeded his authority. For a court to set aside an award on such a ground, the court said, "would impair the flexibility of the arbitral process contemplated by the parties." 478 F.2d at 251.

Our holding today that the Board should have given Umpire Seibel's award its clear precedential effect does not impair the flexibility of the arbitral process, as would have occurred if the court in *Riverboat Casino* had set aside the arbitrator's award. We do not hold that the parties to the collective bargaining agreement in the present case are precluded from arguing in subsequent arbitrations that the arbitrator's earlier award was erroneous. Just as in the judicial sphere the evolution of the common law may require a court to hold that earlier cases were in error, so an arbitrator may decline to follow arbitral precedent when his judgment is that earlier decisions are erroneous. But that does not give the Board the power to make such a judgment for the arbitrator. *See* note 21 *supra* and the discussion of *NLRB v. C & C Plywood Corp.* in text, *infra.*

tion by permanent umpires or chairmen." F. Elkouri & E. Elkouri, *supra*, at 374. Indeed, in the decisions of the umpires selected to decide grievances at Bethlehem's Sparrows Point shipyard, we find an adherence to arbitral precedent that is as scrupulous as a court's application of the doctrine of *stare decisis*. *E.g., Bethlehem Steel Co., Shipbuilding Division, Sparrows Point Yard v. Industrial Union of Marine & Shipbuilding Workers Local 33*, 43 Lab.Arb. (BNA) 228, 230 (1964) (Crawford, Arb.) (precedent regarding consequences of erroneous seniority lists); *Bethlehem Steel Co., Shipbuilding Division, Sparrows Point Yard v. Industrial Union of Marine & Shipbuilding Workers Local 35*, 41 Lab.Arb. (BNA) 587, 589–90 (1963) (Crawford, Arb.) (precedent regarding meaning of contract term allowing extra compensation for unusually dirty work).

The parties to the collective bargaining agreement in the present case would no doubt be highly displeased if arbitral *stare decisis* were as inconstant a doctrine as Fournelle and the Board would have us believe. The whole function of arbitration as a "vehicle by which meaning and content are given to the collective bargaining agreement" would be impaired if the parties could not rely on a settled construction of their agreement. It is instructive to note that neither of the *parties* to this agreement—Bethlehem and the IUMSW—has challenged Umpire Seibel's construction of the no-strike clause. Bethlehem, as is hardly surprising, has maintained throughout that the agreement means what the umpire said; it is perhaps more significant that the IUMSW has not attempted to challenge the validity of Fournelle's suspension.

Therefore, we hold that the Board was not free either to ignore the meaning of the contract or to substitute its own interpretation of the contract for the interpretation of the arbitrator.[23] As the Supreme Court stated in *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967):

> To have conferred upon the National Labor Relations Board generalized power to determine the rights of parties under all collective agreements would have been a step toward governmental regulation of the terms of those agreements. We view Congress' decision not to give the Board that broad power as a refusal to take this step.

*Id.* at 427–28, 87 S.Ct. at 563 (footnote omitted). Of course, the Court has recognized that the Board has a limited power to interpret the agreement when such interpretation is necessary to the exercise of its jurisdiction to remedy unfair labor practices. *Id.* at 428–30, 87 S.Ct. at 563–65. But in the present case there was no such jurisdiction to exercise. We hold that the collective bargaining agreement, including the authoritative interpretation of the arbitrator, imposes special duties on union officials during unauthorized strikes and permits the employer's selective punishment of union officials who flout those duties. When the employer exercised his contractual right to discipline an offending union official, there was no unfair labor practice. The Board's intervention in such a case was an impermissible attempt to decide "a contractual claim that [did] not involve an unfair labor practice." *Kohls v. NLRB*, 629 F.2d 173, 179 (D.C.Cir.1980), *cert. denied*, 450 U.S. 931, 101 S.Ct. 1390, 67 L.Ed.2d 363 (1981).

## V. CONCLUSION

For the reasons set out above, we affirm the Board's order insofar as it concluded that Fournelle was properly subject to disci-

---

**23.** *Compare Cook Paint & Varnish Co. v. NLRB*, 648 F.2d 712 (D.C.Cir.1981), where we rejected the Board's *per se* rule that an employer may not use threats of discipline to compel employees to answer questions concerning an upcoming arbitration proceeding. The Board's *per se* rule, we held, "unnecessarily and impermissibly interferes with the manner in which parties to a collective bargaining relationship structure the arbitration process." *Id.* at 720. Thus, we held that "the legality of pre-arbitration interviews is generally a *contractual* matter to be determined by the parties in establishing a grievance-arbitration procedure, subject only to the normal restraints imposed by the Act that employer conduct not be unlawfully coercive in a particular case." *Id.* (emphasis in original).

pline for his conduct at the union hall in violation of the no-strike clause of the collective bargaining agreement. We deny enforcement of the portion of the Board's order directing Bethlehem to remedy unfair labor practices.

*So ordered.*