**In the Matter of Arbitration Between IN-TERNATIONAL UNION OF PETRO-LEUM AND INDUSTRIAL WORKERS, SIUNA, AFL–CIO, Petitioner,**

**and**

**MARATHON OIL COMPANY, Respondent and Cross-Petitioner.**

**No. CV F 82–211–EDP.**

United States District Court,
E.D. California.

Oct. 7, 1982.

Stuart Libicki, Michael D. Four, Schwartz, Steinsapir, Dohrmann, Krepack, Sommers & Edelstein, Los Angeles, Cal., for plaintiff.

Leonard S. Janofsky, Paul Grossman, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant.

## MEMORANDUM DECISION

PRICE, District Judge.

Petitioner and respondent are parties to a collective bargaining agreement which provides for arbitration of employee grievances arising during the term of the agreement. As is pertinent to this proceeding, the detail of the agreement provides that:

> If a dispute exists as to the arbitrability of a grievance, the issue of arbitrability shall first be determined by an impartial arbitrator selected by the parties. If such grievance is found to be arbitrable, the grievance shall then be submitted to a separate Board of Arbitration selected as provided above, unless the parties agree otherwise. [Article VII(C)(3) of the Agreement.]

The Agreement continues:

> The arbitration hearing and decision shall be confined solely to the specific issue(s) and within thirty (30) days after the hearing is closed, unless extended by mutual agreement of the Company and Union, the Board of Arbitration shall issue its written decision.... [Article VII(C)(4) of the Agreement.]

Finally, as is usual in such situations, the Agreement provided that:

> The award of the Board of Arbitration shall be final and binding upon both parties, provided such award shall be within the scope and terms of this Agreement, shall not change, add to or modify any of its provisions or conditions, and is not decided solely on the basis of practice. [Article VII(C)(5) of the Agreement.]

The factual situation which brings the parties to this court is briefly as follows. On March 20, 1980, the company hired one Mingnon Cummings, a Black woman, as a roustabout. The principal duty of a roustabout is to break down equipment for servicing. At the time of her hiring, Article IX described the seniority status of company employees as follows:

> Seniority: Seniority, for the purposes of this Article, for all employees covered by this Agreement will include all continuous time worked for the Company in the Anchorage Production Division, except that all employees shall be considered casual or temporary employees until employed for a period of six (6) months. No seniority will be considered during the period of casual or temporary hire, but seniority will be retroactive to date of hire when such employees attain regular status. Seniority once attained will continue to accumulate until such employee quits, or is discharged for just cause. [Article IX(A) of the Agreement.]

On September 20, while Ms. Cummings was still within the first six months of her employment, the Union and the Company entered into a letter agreement which read, in pertinent part, as follows:

> The Union is in agreement to extend the probation period of Miss Mingon [sic] Cummings for a period of 90 days beginning on the date September 20, 1980. It is understood that this action will not prejudice the Union's position now or in the future.
>
> The Company agrees that this extension of the probationary period will be used to give Miss Cummings meaningful job assignments that will properly train and prepare her for full employment with Marathon Oil Company.
>
> /s/ Harvey D. Lee
> IUPIW Representative
> /s/ Albert Mechler Jr.
> Marathon Oil Co. Representative
> 9/17/80.

On December 9, 1980, within the period of agreed extension, Ms. Cummings was discharged for alleged unsatisfactory performance and alleged unsatisfactory response to on-the-job training. This triggered a dispute between company and union as to whether or not her grievance was

arbitrable. One Kleinsorge was agreed upon as the "jurisdiction" arbitrator. The issue was submitted to arbitrator Kleinsorge in a statement that must be admired for its simplicity: "Is the discharge of Ms. Mingnon Cummings arbitrable under the collective bargaining agreement?"

On July 31, 1981, arbitrator Kleinsorge issued his award: "The discharge of Ms. Mingnon Cummings is arbitrable under the collective bargaining agreement." Not being satisfied with giving a simple answer to a simple question, however, Kleinsorge elaborated his thought processes in arriving at his award. The full text of his written decision is set forth as Appendix A to this Memorandum Decision.

Although it appears that the company had originally resisted the arbitrability of Ms. Cummings' grievance before arbitrator Kleinsorge, both parties accepted his decision. Accordingly, her grievance was submitted to arbitrator Kienast in November of 1981, as follows:

> Did the Employer violate the Agreement when it discharged Ms. Cummings on December 9, 1980? If yes, what is the appropriate remedy?

On April 7, 1982, arbitrator Kienast issued the following award:

> Grievance denied. The Employer did not violate the Agreement when it discharged Ms. Cummings on December 9, 1980.

Kienast too detailed the reasons for his award. They are set forth in Appendix B to this Memorandum Decision.

## THE KLEINSORGE AWARD

[1] Petitioner's first cause of action requests the court to confirm the Kleinsorge award. A careful reading of the petition, however, indicates that the petitioner really wants the court to go beyond the strict limits of the Kleinsorge award and impose upon the parties the Kleinsorge reasoning as to how the decision on the merits in the matter should be decided. This the court declines to do because it is clearly violative of the provisions of the collective bargain-

ing agreement. An arbitrator's decision shall be "confined solely to the specific issue(s) ... " The only issue which Kleinsorge, as an impartial arbitrator, could have been required to issue was a simple yes or no to the direct question posed to him re arbitrability of the agreement. The intellectual route by which he arrived at his decision adds nothing to the substance of that decision.

■ Finally, the action of the parties themselves has taken from the court any power to deal with the first arbitrator's award. It is noted above in the factual recitation that the parties promptly submitted the grievance to arbitrator Kienast. Hence, the issue of enforcing the Kleinsorge award is now moot.

## THE KIENAST AWARD

As previously stated, the company, although originally resisting the arbitrability of the instant grievance, joined in the second arbitration before arbitrator Kienast. For the first time, evidence on the merits rather than conceptual arguments were pressed upon the arbitrator. Indeed, the record indicates that the arbitration proceeded over three separate days, and the arbitration record was not closed until receipt by the arbitrator of the post-hearing briefs filed some two months later.

Finally, before announcing his award, arbitrator Kienast summarized his reasons for concluding that the employer did not violate the agreement by terminating Ms. Cummings. In doing so, he stated:

> In sum, the Agreement does not require that the Employer have "just cause" for terminating a "casual or temporary employee." But it does require the Employer to terminate such employees only for failure to meet reasonable performance expectations. The evidence supports a finding that the Employer's performance expectations were reasonable and that it had sufficient evidence to conclude that Ms. Cummings' performance fell far short of meeting these expectations. Accordingly, the Employer was within its contractual rights when it

decided to terminate Ms. Cummings. There is insufficient evidence to set this decision aside on the basis of alleged discriminatory treatment. Hence, the grievance is denied.

## THE RELIEF SOUGHT BY PETITIONER

Clearly, there is a diversity of opinion between the two arbitrators. Based upon this, petitioner alleges in paragraph 19 of their second cause of action that:

Arbitrator Kienast exceeded his authority in issuing the Opinion and Award and said Award cannot be corrected without affecting the merits of the Decision upon the controversy submitted to him in that the Arbitrator exceeded his power, jurisdiction and authority by issuing a Decision plainly in conflict with the Decision of Arbitrator Kleinsorge which as a matter of law become a part of the collective bargaining agreement, which the Agreement prohibits him from doing.

In reading the petitioner's supporting documents and carefully following the oral argument of petitioner's counsel at the hearing of this matter, it is abundantly clear that petitioner is really asking the court to go beyond the award and confirm arbitrator Kleinsorge's *reasoning,* thus converting it to the status of "law of the case." This, in the court's opinion, would be a violation of the terms of the agreement which the parties negotiated.

## THE APPLICABLE LAW

[3] With the repetitiveness remindful of the waves of the ocean breaking on the shore, Ninth Circuit opinions have constantly reminded the trial courts that:

The key question is "whether the arbitrator's interpretation could in some rational manner, be derived from the collective bargaining agreement, viewed in light of its language, its content, and any other indicia of the parties' intention." *Local 1020, United Brotherhood of Carpenters v. FMC Corp.,* 658 F.2d 1285, 1294 (9th Cir. 1981). If, on its face, the award "represents a plausible interpretation of

the contract in the context of the parties' conduct", judicial inquiry ceases and the award must be affirmed. *Edna H. Pagel, Inc. v. Teamsters Local 595,* 667 F.2d 1275, 1278–9 (9th Cir.1982). The correctness of the arbitrator's reasoning and conclusion "is not relevant to a reviewing court so long as the award complies with these standards."

The rationale for this method of interpretation was set forth by Judge Learned Hand in *American Almond Products Co. v. Consolidated Pecan Sales Co.,* 144 F.2d 448, 451 (2nd Cir.1944), when he wrote

Arbitration may or may not be a desirable substitute for trials in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid. They must content themselves with looser approximations to the enforcement of their rights than those that the law accords them, when they resort to its machinery.

*Desert Palace v. Local Joint Exec. Bd. of Las Vegas,* 679 F.2d 789, 792 (9th Cir.1982).

Clearly, this mandate precludes the trial court from substituting its own judgment as to which of the two interpretations is the correct one. While nothing could be clearer that both arbitrators based their reasoning upon the specific provisions contained in the agreement, it is not for this court to choose which most nearly conforms with its interpretation of the agreement.

Admittedly, the decision of an arbitrator as to whether the controversy is arbitrable is subject to broader and more rigorous judicial review. *See Intern. Broth of Team., Etc. v. W. Pa. Mo. Car.,* 574 F.2d 783 (3rd Cir.1978). However, as previously pointed out, we need not reach that issue here, because both parties accepted the first arbitrator's decision with reference to the arbitrability of the grievance.

The next inquiry must be whether or not the statements by Kleinsorge have binding

effect upon a subsequent arbitrator considering the same grievance.

Assuming arguendo for purposes of this discussion only that Kleinsorge's statement of reasons constituted an integral part of his award, and hence his decision is to be considered in its totality, we are immediately faced with a division of authority among the circuits. The Ninth Circuit, in *Riverboat Casino, Inc. v. Joint Executive Board of Las Vegas*, 578 F.2d 250, 251 (9th Cir. 1978), stated that:

> "[I]f, on its face, the award represents a plausible interpretation of the contract in the context of the parties' conduct, judicial inquiry ceases and the award must be affirmed." *Holly Sugar Corp. v. Distillery Union*, 412 F.2d 899, 903 (9th Cir. 1969).

The award in this case satisfies these criteria. We reject appellant's contention that the arbitrator was bound by the prior arbitration award. Absent a provision in the contract to the contrary, the arbitrator could reasonably conclude that strict adherence to stare decisis would impair the flexibility of the arbitral process contemplated by the parties. But even if the arbitrator were incorrect in this assessment of the parties' intent and erred in not following the prior arbitral award, we could not for that reason vacate the award.

This holding has been cited with approval in the Third Circuit [*Metropolitan Edison Co. v. NLRB*, 663 F.2d 478, 483 (3rd Cir. 1981)], and construed very narrowly by the District of Columbia Circuit in *Fournelle v. NLRB*, 670 F.2d 331 (D.C.Cir.1982), *see* n. 22, at 344. The *Fournelle* court, however, expressly rejected the concept that past arbitration rulings cannot be given precedential effect absent an express contractual

term so providing. The Fifth Circuit, in *W.R. Grace & Co. v. Local Union No. 759, Etc.*, 652 F.2d 1248 (5th Cir.1981), seemed, by inference, to approve of the notion that arbitrator's awards were without precedential value.

In *General Teamsters, Etc. v. Mitchell Bros. Truck Lines*, 682 F.2d 763 (9th Cir. 1982),[1] the majority opinion expressly rejected the notion that a labor arbitrator was bound by the doctrine of collateral estoppel where allegedly the factual issue had previously been decided in a state court proceeding.

## ATTORNEY'S FEES

Both sides concede factually that the instant case represents a case of first impression. The employer argues eloquently that despite the established principles of labor relations/arbitration law being so clear, once the union received their responding papers, their continued pursuit of their petition was unfounded and without justifiable basis. The court did not find the issue presented to it that easy to resolve.

The court notes that the Ninth Circuit authority cited to the court by the parties presented a different factual basis than the instant case.[2] Indeed, in all of the cases viewed by the court, the court could not find a single instance of the same grievance, after being reviewed by two separate arbitrators, resulting in such diametrically opposed interpretations of the contract. It is the court's view, as I have attempted to explain, that arbitrator Kleinsorge's reasons for the award did not constitute his award and were simply explanatory of his thought processes. It did not represent a decision on the merits of the grievance. Arbitrator Kleinsorge could well have said that the

---

1. At the moment, the court is informed by the Office of the Clerk of the Ninth Circuit that a petition for rehearing and suggestion of a hearing *en banc* has been filed in this case, and has not finally been disposed of. Hence, the decision is not yet final. The case is cited to alert readers of this opinion that it is still possible that there *may be* a re-examination by the Ninth Circuit of its present position in this area.

2. All of the cases reviewed by the court involved subsequent arbitration of grievances impinging upon the same provisions of the collective bargaining agreement, but concerning different grievants. None of the cases reviewed by the court involved the *same contractual provisions* being applied to the *same grievant* in a single factual context.

collective bargaining agreement was ambiguous in the pertinent parts involved in this dispute, and hence the agreement was arbitrable. The fact that he chose not to do so does not change the character of his holding.

■ Cases may arise where attorney's fees are justified because a party uses the court proceeding as a mechanism to delay the affect of an arbitrator's decision. This would more probably occur in those instances where the arbitrator's award carries with it a monetary judgment against the unsuccessful party. That factor is absent here. Clearly, the parties are seeking guidance on future conduct of their labor relations in an area that previously has not been resolved.

In summary, the court holds that:

1. The issue of enforceability or unenforceability of arbitrator Kleinsorge's award has been mooted by the voluntary action of the parties.

2. Arbitrator Kleinsorge's reasoning as to why he found the grievance to be arbitrable is not binding upon the arbitrator Kienast, it having no precedential value.

3. Under the Ninth Circuit law as detailed above, the court finds that the award of arbitrator Kienast represents a plausible interpretation of the contract in the context of the parties' conduct.

4. Petitioner's petition to revoke arbitrator Kienast's award and to remand the matter for further arbitration proceedings is therefore denied.

5. Respondent's cross motion to confirm arbitrator Kienast's award is granted.

6. Each party shall bear its own attorney's fees.

## APPENDIX A

| Marathon Oil Company | Issue: | Is the discharge of Miss Mingnon Cummings arbitrable under the terms of the collective bargaining agreement? |
| --- | --- | --- |
| and | | |
| International Union of Petroleum and Industrial Workers | | |

Date of award: July 31, 1981

### The Case

Mingnon Cummings was employed by the Company on March 20, 1980, as a roustabout 2 (or roustabout trainee). This is the beginning job in the Company's classified wage schedule, but for a satisfactory employee, it holds the possibility of progression up the job ladder to roustabout 1, utilityman and operator. The Company felt that Cummings was not making satisfactory progress as a roustabout 2, and prior to September 20, 1980, the Company decided to terminate Cummings' employment. After a meeting between the Company and the Union on Cummings' case, however, it was agreed by the Company and the Union that Cummings' temporary status would be extended for ninety days beginning September 20. In December, the Company decided that Cummings' progress still was not satisfactory, and Cummings was discharged as of December 9. The Union protested the discharge, and a grievance was filed. The Company refused to entertain the grievance on the grounds that Cummings was a casual or temporary employee, and that, therefore, her grievance was not arbitrable.

The provisions of the collective bargaining agreement cited by the parties at the hearing are as follows (in order of their appearance in the agreement):

Article I, Recognition: ... the Company recognizes the Union as the exclusive bargaining agent for purposes of collective bargaining with respect to rates of pay, wages, hours of work, and other conditions of employment for those so certified as follows:

All production and maintenance employees employed by the employer at its operations ....

Article VII. Grievance and Arbitration Procedure: Section A, Limitations, (1): A grievance exists when an employee or group of employees or the Union believes he has or they have been denied their rights under this Agreement by reason of the application of any of its specific provisions.

Section B, Grievance Procedure: The Union and/or an employee or group of employees shall have the right to present grievances that affect him or them to the Company. Individual grievances shall be settled in accordance with the following procedure: ....

Section C, Arbitration Procedure (5): The award of the Board of Arbitration shall be final and binding upon both parties, provided such award shall be within the scope and terms of this Agreement, shall not change, add to or modify any of its provisions or conditions, and is not decided solely on the basis of practice.

Article VIII, Termination of Employment: Section B: Nothing in this Agreement shall limit the right of the Company to demote, discipline or discharge an employee for just cause.

Article IX, Seniority, Section A: Seniority for the purposes of this Article, for all employees covered by the Agreement will include all continuous time worked for the Company in the Anchorage Production division, except that all employees shall be considered casual or temporary employees until employed for a period of six (6) months. No seniority will be considered during the period of casual or temporary hire, but seniority will be retroactive to date of hire when such employees attain regular status. Seniority once attained will continue to accumulate until such employee quits or is discharged for just cause.

Article XXI, Miscellaneous, Section B: The Company and the Union agree that there shall be no discrimination against any employee because of sex, race, color, creed or national origin.

### The Arguments

*Company*

The Company introduced testimony to show that when the first collective bargaining agreement was negotiated in 1971, the Union proposed that the probationary period be limited to ninety days. The Company argued that a ninety-day period was not enough time to determine an employee's capabilities; and that a six months' probationary period would be more appropriate. The result was that a six months' period during which seniority would not be granted was adopted as indicated in Article IX, Section A, of the collective bargaining agreement. Except for the change from ninety days to six months, it was the Union's language that was adopted for this provision. The Company argues that the Union (as author) now is estopped from placing a different interpretation on the language from that which was intended. It was the Company's understanding that during the six months' period, it could discharge a casual or temporary employee for any reason or no reason. It did not have to show just cause for the discharge.

In Cummings' case, the Company at first determined (prior to September 20, the end of her probationary period) that she should be discharged, but then decided that because of the particular circumstances of her case, her probationary period should be extended three months to December 20. The Company's proposal to the Union was for a one-time request for Cummings only that would not serve as a precedent for future cases. The Union agreed to this proposal provided that its position would not be prejudiced, and that Cummings would be given meaningful job assignments that would properly train and prepare her for full employment with the Company. As far as the Company was concerned, the same rules applied to the period from September 20 to December 20 as had applied to the period from March 20 to September 20, and the Company could discharge Cummings any time prior to December 20 without having to show just cause. The Company agrees that casual or temporary employees enjoy benefits and that they could file grievances involving such problems as overtime, but the Company maintains that they have no seniority rights, and that without seniority they have no right to file grievances involving discharge.

The Company believes that its interpretation of Article XI,A is supported by past practice. The Company cites a 1975 case involving a temporary employee named Busby. Busby was discharged, and he filed a grievance. The Company refused to consider the grievance on the ground that Busby was a temporary or casual employee and had no seniority. Without seniority he was not eligible to file a grievance involving

discharge. The Union did not pursue the matter further, and the Company assumed that its position had been accepted. The Company feels that the Busby case serves as a precedent for the present (Cummings) case.

The Company argues that it is a well known principle followed by most arbitrators that new employees will not accrue any seniority until after they complete the probationary period. Even though the contract is silent as to the employer's right to terminate such employees, normal industrial relations practice holds that the employer is permitted to discharge at will any employee during that period. The Company cites five arbitration awards to support this position on the arbitrability question, three of which were discussed in the Company's brief. The first of the three was the *Joy Manufacturing Company*, 6LA (1946). In that case the collective bargaining agreement provided:

> Any new employee hired by the Company shall have no seniority until he has worked for the Company for the applicable probationary period established by Article IV, and after such period, if he is retained, he shall from his hiring date, have seniority in the plant division in which he works.

The arbitrator denied arbitrability of a grievance protesting the discharge of a probationary employee on the ground that normal industrial relations practice allows the employer to discharge at will during the probationary period.

The second case discussed by the Company was *John Inglis Company, Limited,* 58 LA 430 (1972). In that case the collective bargaining agreement provided:

> Employees shall be regarded as probationary until they have completed thirty (30) worked days of employment with the company during any twelve (12) month period. After completion of such period their names shall be placed on the seniority list as of the first date of hiring during such twelve (12) month period.

The arbitrator held that although probationary employees could grieve their discharge during the probationary period, it was not for the arbitrator to say whether the company had made the correct decision in determining that a probationary employee was not satisfactory.

The third case discussed by the Company was *Ex-Cell-O Corporation,* 21 LA 659 (1953). In that case the arbitrator held that the employer could discharge a probationary employee without showing just cause unless the employer had acted arbitrarily, capriciously, or discriminatorily. In the present case, the Company maintains that the evidence shows clearly that it did not act arbitrarily, capriciously, or discriminatorily in discharging Cummings.

The Company points out that Article XXI, B, of the collective bargaining agreement contains the standard clause prohibiting discrimination. The Company argues, however, that this provision does not override the seniority provisions of Article IX,A, because to do so would be unfair to employees not protected by Article XXI,B (white males, for instance). If the Arbitrator ruled that Article XXI,B, overrides Article IX,A, he would in effect be modifying Article IX,A, which he is prohibited from doing by Article VII,C. The Company states that if Cummings believes she has been discriminated against because of her sex and race, she should proceed under the various state and federal statutes. The Union is not the private enforcer of Title VII of the Civil Rights Act, and the question of discrimination should play no part in determining the arbitrability of Cummings' case under the collective bargaining agreement.

*Union*

The Union states that under Article I of the agreement, the Union has the right and the duty to represent all employees in the bargaining unit. The Union points out that there is nothing in Article IX which prevents a casual or temporary employee from filing a grievance. The article merely states that all employees shall be considered as casual or temporary until employed for six months, and that no seniority will be considered during the period of casual or temporary hire. When seniority has been

attained, it is used for such things as promotion and lay-off, but there is no provision in the agreement that denies any employee access to the grievance and arbitration procedure. Since this is the case, the Union maintains that the Arbitrator has no authority to rule that Cummings' grievance is not arbitrable. If the arbitrator did so, he would in effect be adding to a provision in the agreement which is forbidden by Article VII,C(5). The Union concludes that Cummings' discharge is both grievable and arbitrable.

The Union notes that Cummings is a black female, and believes that the Union might be in violation of Title VII of the Civil Rights Act, as well as of the National Labor Relations Act and the collective bargaining agreement, if it failed to pursue Cummings' case. The Union argues that the Company has not shown just cause for discharging Cummings as provided in Article VIII,B, and that under these circumstances the Union must take Cummings' case through the grievance procedure in order to comply with the law. The Union intimates that Cummings was discharged because of her race and sex, which is in violation of Article XXI,B, but since the merits of Cummings' case are not involved in the present dispute, no proof was offered to support this possibility.

The Union does not recognize the 1975 Busby case as a precedent for the present case. It is true that the Union did not pursue the Busby grievance, but the Union's decision not to pursue the case was not because the Union had agreed that Busby's status as a casual or temporary employee denied him the right to file a grievance. It was because the Union's investigation had shown that Busby had behaved very badly as an employee, and deserved to be discharged. Therefore the grievance was dropped. In Cummings' case the circumstances are different. In the Union's opinion, there is no precedent or past practice to support the Company's contention that Cummings' case is not arbitrable.

## Discussion

The Arbitrator believes that the collective bargaining agreement should be interpreted as the language of the agreement indicates. In this regard, the Arbitrator notes that Article IX,A, does not use the phrase "probationary period" or "probationary employees." Instead, the provision uses the terms "casual or temporary employees" and "period of casual or temporary hire." The Company assumes that the words "casual or temporary" when linked with the granting of seniority are synonymous with "probationary," but the Arbitrator does not think this is necessarily true. To the Arbitrator, "probation" strongly indicates a testing or trial. The term "casual or temporary" does not. Even with the reference to the granting of seniority, there is nothing in Article IX,A, (or elsewhere in the Agreement) that gives the Company the right to discharge casual or temporary employees at will. There is nothing specific, and there is nothing in the wording which would allow the Arbitrator to imply that such a right exists. For the Arbitrator to do so would in effect add to the wording of Article IX,A, which the Arbitrator is prohibited from doing by Article VII,C, (5).

The Arbitrator notes further that Articles VII and VIII do not except casual or temporary employees from their provisions, even for discharge cases. These articles refer to an employee or to employees in general. Casual or temporary employees certainly are employees, and since they are not excepted, they are covered by the provisions. This means that they may file grievances and use the grievance procedure including arbitration. They may be discharged for just cause. According to the wording of the provisions they should be treated as employees in the same way as other employees.

The Company outlined the history of the negotiation of Article IX,A, to show that the intent was to give the Company the right to discharge a casual or temporary employee at will. Undoubtedly this was the Company's intent, but there is no evidence one way or the other that it was also

the Union's intent. If the Company and the Union had intended the Company to have such a right, it should have been spelled out specifically in Article IX,A, as it is in many other agreements, but since this was not done, the question of intent remains unanswered. Under these circumstances, the Arbitrator does not believe that the Union (as author of the provision) is estopped from placing a different interpretation on the provision from the one the Company thought was intended.

The Company referred to the Busby case as a precedent for the present case. The Arbitrator feels that the Union was remiss in not explaining to the Company why it was not pursuing the Busby case, and he thinks that the Union's neglect gave the Company reason to assume that its interpretation of Article IX,A, was correct. Forever, the Arbitrator does not believe that one instance establishes past practice, and he decides again that it is the wording of the agreement that must be accepted.

The Arbitrator read in their entirety all of the arbitration cases cited by the Company as support for its position on the arbitrability question. The Arbitrator notes that Article IV of the collective bargaining agreement in the Joy Manufacturing Company case refers to "a ninety (90) day probationary period (for new employees) if they are retained by the Company." In the Arbitrator's opinion, this wording is far stronger than the wording in Article IX,A, in the present case. The term "probationary period" is used, and there is the suggestion that new employees might not be retained. In the Joy case the arbitrator assumed that normal industrial relations practice allows for the employer to discharge at will a new employee during the probationary period. This may be a valid assumption when the wording is as it is in the Joy case, but the Arbitrator does not believe that it applies to the wording of the present case.

In the John Inglis Company case, Article 23 of the collective bargaining agreement also uses the word "probationary." In that case the arbitrator decided that a probationary employee was entitled to file a grievance, because probationary employees were not expressly excluded from the benefit of filing grievances. However the arbitrator also decided that the discharge of a probationary employee was not arbitrable where the grievant made no allegation in his grievance which would entitle him to relief. The present (Cummings) case is similar to the Inglis case in that the agreement does not specifically exclude casual or temporary employees from the use of the grievance procedure. It is different in that the grievant made an allegation which would entitle her to relief. On the grievance form, she accused the Company of treating her in a capricious and discriminatory manner. The Inglis case, therefore, involves different considerations than in the present case.

In the Ex-Cell-O Corporation case, the arbitrator held that the discharge of a probationary employee is arbitrable where the contract does not expressly restrict the arbitration procedure to regular employees or state that management decisions to discharge probationary employees are final. This would appear to support the Union's position in the present case, but the arbitrator also held that the Company's decision to discharge must be upheld unless it is shown that the discharge was arbitrary, capricious, or discriminatory. In the Ex-Cell-O case, the arbitrator found six instances in which the probationary employee's performance had been deficient, and on this ground, he decided that the company had not been arbitrary, capricious, or discriminatory. In the present case there is no specific evidence as to Cummings' competence, because the parties agreed that only the issue of arbitrability under the terms of the contract would be discussed. The Company claims that the extension of Cummings' period as a casual or temporary employee proves that the Company did not act in an arbitrary, capricious, or discriminatory manner, but in view of Cummings' accusation on the grievance form, the Arbitrator believes that more specific information on this point should be made available by both parties.

The Arbitrator decides, therefore, that under the terms of the collective bargaining agreement, the Cummings case is arbitrable. The Arbitrator believes that this is the only conclusion he could reach without in effect modifying the wording of the agreement. This means that although the Company may discharge a casual or temporary employee (or any other employee), the Company must show just cause. The employee may file a grievance to the effect that the Company did not have just cause, and this grievance may be arbitrated. Under the terms of the agreement as they are worded, Cummings' grievance should be entertained by the Company, and it should be considered as arbitrable. Since the Arbitrator has reached this conclusion, it is not necessary for him to consider the Union's arguments concerning the possible effect of Title VII of the Civil Rights Act, or the Company's arguments concerning discrimination under Article XXI,B, of the agreement.

### Award

The discharge of Miss Mingnon Cummings is arbitrable under the terms of the collective bargaining agreement.

/s/ Paul L. Kleinsorge
Paul L. Kleinsorge
Arbitrator

### APPENDIX B

IN THE MATTER OF ARBITRATION

| | |
|---|---|
| MARATHON OIL COMPANY ) | OPINION AND AWARD |
| ) | of |
| -and- ) | Philip Kienast |
| ) | April 7, 1982 |
| INTERNATIONAL UNION OF ) | |
| PETROLEUM AND INDUSTRIAL ) | RE: Cummings Discharge |
| WORKERS SIUNA, AFL–CIO ) | FMCS 81K 10175 |

### APPEARANCES

*For the Union:*

George Beltz, International Representative

*For the Employer:*

John M. Miller, Senior Labor Counsel

*Reported by:* R & R Court Reporters, Anchorage, Alaska

### OPINION

This proceeding is in accordance with Article VII of the parties 1978–81 Agreement (J1). A hearing in this matter was held on November 19, 20 and 21, 1981 and the record closed upon receipt by the Arbitrator of post hearing briefs on March 3, 1982. The issue stipulated for decision was:

Did the Employer violate the Agreement when it discharged Ms. Cummings on December 9, 1980?

If yes, what is the appropriate remedy?

*Pertinent Agreement Provisions*

### ARTICLE II—SCOPE AND TERMS OF AGREEMENT

C. Subject to the provisions of this Agreement, the supervision and control of all operations and the direction of all working forces, such as the determination of the size of the work force; the contracting of work; the right to hire, suspend, discipline, and discharge for just cause; the establishment of work rules; the assignment of employees to jobs and assignment of duties to employees are vested in the Company. It is agreed that the provisions of this Article shall not be exercised for the purpose of violating the terms of this Agreement, insofar as the Union or an individual employee is concerned.

### ARTICLE VII—GRIEVANCE AND ARBITRATION PROCEDURE

A. Limitations

(1) A grievance exists when an employee or group of employees or the Union believes he has or they have been denied their rights under this Agreement by reason of the application of any of its specific provisions.

\*　　\*　　\*　　\*　　\*　　\*

(6) . . . . In all cases of grievances presented under this grievance procedure, each of the parties hereto agrees to furnish the other party with all information in its possession regarding such grievances which may be necessary to a full understanding of the

subject matter of the complaint and to facilitate the prompt handling of complaints.

ARTICLE VIII—TERMINATION OF EMPLOYMENT

A. Before a satisfactory employee with one or more years of continuous service is laid off for lack of work, the Company will make every reasonable effort to place said employee in some other work in the bargaining unit for which his qualifications and seniority status permit.

B. Nothing in this Agreement shall limit the right of the Company to demote, discipline or discharge an employee for just cause.

ARTICLE IX—SENIORITY

A. *Seniority* Seniority, for the purpose of this Article, for all employees covered by this Agreement will include all continuous time worked for the Company in the Anchorage Production Division, except that all employees shall be considered casual or temporary employees until employed for a period of six (6) months. No seniority will be considered during the period of casual or temporary hire, but seniority will be retroactive to date of hire when such employees attain regular status. Seniority once attained will continue to accumulate until such employee quits, or is discharged for just cause.

ARTICLE XXI—MISCELLANEOUS

B. The Company and the Union agree that there shall be no discrimination against any employee because of sex, race, color, creed or national origin.

Mingnon Cummings, a black woman, was one of two females hired on March 20, 1980 as casual or temporary employees to work as roustabouts at the Employer's Trading Bay facility on Cook Inlet, Alaska. The facility processed gas and oil pumped from offshore platforms. Roustabout work involves general maintenance duties but focuses on the use of small tools such as wrenches and hammers to break down processing equipment for maintenance, repair or modification. These two women were the first females hired to work at the facility and worked seven days of twelve hour shifts and then had seven days off.

At the end of six months of employment the other employee, Rita Ohlert, attained regular employee status. However, Ms. Cummings' tenure as a temporary employee was extended due to facility management's perception that she had not yet demonstrated her capability to perform all the duties required of a roustabout. This extension was a matter of specific agreement with the Union (E12):

The Union is in agreement to extend the probation period of Miss Mingon Cummings for a period of 90 days beginning on the date September 20, 1980. It is understood that this action will not prejudice the Union's position now or in the future.

The Company agrees that this extension of the probationary period will be used to give Miss Cummings meaningful job assignments that will properly train and prepare her for full employment with Marathon Oil Company.

/s/ Harvey D. Lee
IUPIW Representative

/s/ Albert Mechler Jr.
Marathon Oil Co. Representative
9/17/80

Toward the end of this ninety day extension the Employer determined that Ms. Cummings had not become sufficiently competent to be given regular status and terminated her employment and so notified her in a letter of December 9, 1980 (J2):

As we discussed in the meeting in my office on December 9, 1980, you have failed to make satisfactory progress during your probation period and the extension thereof.

For this reason, we regretfully inform you that your employment with Marathon Oil Company is hereby terminated, effective December 9, 1980.

*Contentions*

The Union contends that Ms. Cummings was not discharged for just cause. It argues that shortcomings in the grievant's performance were primarily due to incom-

petent supervision and a concerted effort by her coworkers to insure her failure. Moreover, the Union argues that there is some evidence that this treatment of the grievant was in part racially motivated. On a procedural matter, the Union contends that some of the Employer's evidence should be excluded since it was not provided to the Union prior to the Arbitration hearing. It argues that Section 6 of Article VII places this kind of disclosure burden on the Employer.

The Employer contends that "just cause" is not applicable since Ms. Cummings was still a probationary employee. It argues that the preponderance of evidence supports its finding that the grievant was a marginal worker, and, therefore that it was not arbitrary or capricious in its decision to deny the grievant "regular status" per Article IX. Also, the Employer maintains the only evidence of racial discrimination was one comment made by a coworker to other employees when the grievant was absent. It argues this is insufficient grounds for a finding that the management violated Article XXI,B when it terminated Ms. Cummings from employment. As to the procedural issue raised by the Union, the Employer contends that Article VII does not require full disclosure of all the Employer's evidence, but rather only sufficient evidence for the Union to understand the grounds for its action.

*Analysis and Conclusions*

The initial question to be addressed is whether the Employer's termination of Ms. Cummings should be measured against the just cause standard. The Arbitrator concludes for several reasons that it should not. Contracts should be read as a whole such that each part can be given reasonable effect within the context of its general purpose. In the Arbitrator's opinion the Union's position is less consistent with the principle of contract construction than is the Employer's.

The first sentence of Article IX clearly distinguishes "casual or temporary" employees from "regular status" employees. In the Arbitrator's opinion this distinction would be virtually meaningless if Article VIII(B) were interpreted to apply to the former as well as the latter. What reason would there be for making the distinction if both groups were to have just cause protection. Certainly not to protect regular status employees from being adversely impacted because a casual or temporary employee exercised his or her seniority rights. By definition regular status employees would always be more senior.

In addition, the last sentence of Article IX(A) implies that attaining seniority is equivalent to achieving just cause protection. If a regular status employee does not quit then he or she can be terminated only for just cause. By implication if he or she has no seniority then the just cause standard does not apply, i.e. just cause protection is a right secured through attaining seniority.

A consistent interpretation of Article VIII(B) is that the "employees" intended to be covered by that general language were "regular status employees" and not "casual or temporary employees." Such a finding is consistent with another major rule of construction: specific language controls over general language.

The foregoing interpretation is also consistent with the behavior of the Union in agreeing with the Employer to extend the grievant's period of temporary or casual employment. The agreement quoted earlier was written on Union stationary and presumably was drafted by the Union. The opening statement talks of extending Ms. Cummings' "probationary period." This term is repeated in the second paragraph. In the Arbitrator's opinion the use of this language by the Union implies that at the time of this agreement the Union viewed Article IX(A) as the equivalent of a standard "probationary employee" clause found in many other collective agreements. Therefore, the Union's prior behavior implies an interpretation consistent with that given above through application of major principles of contract construction.

What standard or test must the Employer's discharge of the grievant measure up to

if not the just cause standard? By definition a probationary employee is one who is being tested to see if he or she can meet certain performance expectations. Implicit in this definition is that if an employee meets these performance expectations then he or she will attain regular employee status. Accordingly, the Employer must show that its performance expectations were reasonable, were applied equally to all employees per Article XXI and that it had substantial evidence that the employee failed to meet these performance expectations. In the Arbitrator's opinion, failure of Employer to successfully shoulder any of the foregoing burdens would be cause for a finding by him that it violated the Agreement.

The record discloses that the Employer's performance expectations were reasonable. They included the expectation that the grievant be able to perform moderately strenuous physical labor, e.g. carry buckets full of sand from the pit; follow proper procedures when performing routine maintenance functions, e.g. jetting the monopod; be able to use the proper tools in a correct and efficient way when doing "wrench work" e.g. disassemble a pump; safely and efficiently operate equipment, e.g. the winch truck. The Union did not argue, let alone prove, that these performance standards were unreasonable in any way.

The record also discloses that the performance expectations for Ms. Cummings were the same as those for Ms. Ohlert. Indeed, for most of the period in question they worked side by side or alternately at the same tasks. Once again, the Union did not argue, let alone prove, that the grievant was asked to perform at a level on any task not similarly required of Ms. Ohlert.

The Union argued, but did not prove, that Ms. Ohlert received more attention and training than did Ms. Cummings. Both individuals were treated the same, namely, on-the-job training. In the final analysis it appears that Ms. Ohlert responded to this kind of training while the grievant did not. The fact that a different training approach might have been more successful on Ms. Cummings, the fact remains that the Employer was under no contractual obligation to provide such training. Even the agreement reached with the Union to extend the grievant's period as a temporary required no more than that Ms. Cummings be given an opportunity to perform the full range of duties expected of a roustabout. Article II clearly leaves operational decisions such as the type of training to be offered to the discretion of the Employer. In the final analysis it appears that the grievant was unsuited to training via the on-the-job approach.

The discussion now turns to the matter of proof, namely, did the Employer prove that Ms. Cummings failed to meet its performance expectations? It was in regard to this matter that the Union raised an objection to testimony and exhibits being admitted that had not been previously disclosed to the Union in the grievance procedure. The Arbitrator does not read the requirement of Section 6 of Article VII as rigidly as does the Union. He interprets the requirement as having been met by the Employer when it provided the Union with the termination notice and the series of thirty day evaluation reports on Ms. Cummings. In the Arbitrator's view this information met the Employer's 'prima facia' burden to give the Union information sufficient to a "full understanding of the subject matter of the complaint." If the Union wanted the specific incidents on which these evaluations were based it should have requested same because it is the party that must ultimately determine what "may be necessary to a full understanding" of the grievance. Having made no such request it cannot now claim it did not fully understand the matter.

Persuasive evidence was submitted by the Employer regarding Ms. Cummings' failure to meet the performance expectations found previously to have been reasonable. The Union claims much of this evidence is tainted because it was provided by individuals who stood to gain personally by the grievant's discharge, i.e. Donald Wright, Gregory Beckley, Terry Johnson and Ron Johnson. But, it is equally true that they stood to realize the same personal gains if

they could have made reports that resulted in the discharge of Rita Ohlert during her trial period. Yet, they made no such reports and Ms. Ohlert was given regular status to their apparent detriment.

In the final analysis, the testimony of all four of these individuals on basic deficiencies in the grievant's job performance was corroborated by the testimony of Ms. Ohlert. Her motivation was not challenged by the Union. The testimony of all these individuals taken together with the formal evaluations clearly show that the grievant's overall performance was unsatisfactory.

This is not to say that Ms. Cummings did not on occasion perform an assignment satisfactorily. The testimony of Union witnesses show that the grievant did on at least a few occasions perform satisfactorily. However, this testimony came from individuals who had very limited contact with the grievant on the job whereas the five Employer witnesses worked closely with Ms. Cummings on a daily basis. In the final analysis, the testimony of the Union witnesses (Michael Ryherd, Terry Casseday, Billy Rogers, Richard Perry and Dan Koplin) only establishes that Ms. Cummings was not totally incompetent, not that she consistently performed satisfactorily.

A final consideration is whether the Employer's treatment of Ms. Cummings was racially discriminatory and therefore a violation of Article XXI. The record discloses scant evidence to support a finding of racial discrimination. It is uncontested that Terry Johnson made a racially derogatory statement about Ms. Cummings in the presence of two other employees. However, neither Ms. Cummings nor any supervisors were present to hear this racial slur. Mr. Johnson had no supervisory responsibilities over Ms. Cummings. There is no other evidence of any concerted activity by supervision or coworkers to get rid of Ms. Cummings because she was black. The simple fact that coworkers might desire to have a competent coworker rather than a marginal one does not prove that the grievant was the object of racial discrimination. Moreover, when questioned by the Arbitrator about the grievance allegation of discrimination, Ms. Cummings did not support the

allegation with any relevant evidence (Tr. 672–675). Accordingly, the Arbitrator finds insufficient evidence on which to conclude that the Employer violated Article XXI.

In sum, the Agreement does not require that the Employer have "just cause" for terminating a "casual or temporary employee." But it does require the Employer to terminate such employees only for failure to meet reasonable performance expectations. The evidence supports a finding that the Employer's performance expectations were reasonable and that it had sufficient evidence to conclude that Ms. Cummings' performance fell far short of meeting these expectations. Accordingly, the Employer was within its contractual rights when it decided to terminate Ms. Cummings. There is insufficient evidence to set this decision aside on the basis of alleged discriminatory treatment. Hence, the grievance is denied.

### AWARD

1. Grievance denied.
2. The Employer did not violate the Agreement when it discharged Ms. Cummings on December 9, 1980.

/s/Philip Kienast
Philip Kienast
April 7, 1982
Seattle, Washington